Charlene **MORRISSEY**, Plaintiff,

v.

Elizabeth **MANTICA**, R.N., Defendant.

Civil Action No. 06–11761–RBC.

United States District Court,
D. Massachusetts.

Oct. 6, 2008.

Kenneth M. Levine, Law Office of Kenneth Levine, Brookline, MA, Sheila Mone, Kenneth M. Levine & Associates, Boston, MA, for Plaintiff.

Debra I. Lerner, Michael J. Mazurczak, Melick, Porter, & Shea LLP, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER ON DEFENDANT ELIZABETH MANTICA'S MOTION FOR SUMMARY JUDGMENT (# 41)

COLLINGS, United States Magistrate Judge.

#### I.  Introduction

On September 28, 2006, plaintiff Charlene Morrissey ("Morrissey" or "the plaintiff") filed a complaint (# 1) against defendant Elizabeth Mantica, R.N. ("Mantica" or "the defendant")[1].  On December 28,

---

**1.** In the same complaint, Morrissey alleged claims against Carrie Patel, R.N., Cheongran Jung, R.N. and a Jane Doe, R.N. On December 13, 2006, the plaintiff filed a notice of voluntary dismissal (# 7) pursuant to Fed. R.Civ.P. 41(a)(1) as to defendant Patel.  On January 23, 2008, a stipulation of dismissal was entered as to defendant Jung. (# 36) The record does not reflect any further involvement as to the defendant referred to as Jane Doe.

2006, Mantica filed an answer (# 10) to the complaint.

On January 24, 2007, the parties filed a joint motion for referral to a medical tribunal (# 14). The motion was granted (# 16) and on January 25, 2007 the civil case was terminated. The medical tribunal found for Morrissey (# 18), allowing her to move forward with her lawsuit. In consideration of these findings, the Court reopened the civil action on May 18, 2007.

With the parties' consent (# 40) on March 26, 2008, this case was referred and reassigned to the undersigned for all purposes including trial and the entry of judgment pursuant to 28 U.S.C. § 636(c). On March 31, 2008, Mantica filed a motion for summary judgment (# 41) together with a statement of undisputed facts, a memorandum of law and exhibits (# 42). On April 18, 2008, Morrissey filed an opposition to the summary judgment motion with exhibits, including the affidavit of Charlene Morrissey dated April 10, 2008(# 46). With leave of Court, on May 19, 2008, Mantica filed a reply brief in support of her motion for summary judgment (# 47). At this juncture, the motion for summary judgment is poised for decision.

## II. Factual Background

According to the allegations of the complaint, on or about September 30, 2003, the plaintiff submitted herself to the care and treatment of Mantica. Morrissey asserts that during the course of her care and treatment, Mantica treated her in such a way as to cause her severe personal injuries.

It is undisputed that on September 29, 2003, Morrissey underwent a medial unicompartmental knee replacement at Lowell General Hospital ("LGH") under the care of David Morley, M.D. (# 43 at 3,¶ 2; # 46 at 2,¶ 2) It is further undisputed that Morrissey received post-operative care at LGH, including the use of a knee immobilizer, a constant passive motion ("CPM")

machine, and physical therapy. (# 43 at 3, ¶ 3; # 46 at 2, ¶ 3)

Morrissey alleges that on the morning of September 30, 2003, someone placed her leg into a CPM machine while she was still wearing a knee immobilizer. A CPM machine is used when providing physical therapy to a patient; it "allows the patient's knee to be flexed, extended and held in certain positions for a predetermined number of times per cycle." (# 43, Exh. A at 2) According to Morrissey's doctor who has provided an expert report in this case, the standard of care when using a CPM machine is to ensure that the patient's knee is "unrestricted and moving freely." (# 43, Exh. L at 1–2) As such, the knee immobilizer, which is intended to keep the knee still, should be removed prior to applying a CPM machine to avoid "post-operative stress, [interference] with the healing process, and ... the need for subsequent medical intervention." (# 43, Exh. L at 2) Morrissey alleges that as a result of her leg being put in the CPM machine while her knee was still immobilzed, she has suffered "excessive pain and inflammation," never properly recovered from her original surgery, and required subsequent surgical procedures. (# 43, Exh. E at answer 8)

## III. Summary Judgment Standard

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas–Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1 Cir., 2005) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1 Cir., 1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)); *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1 Cir., 1990). The party moving for summary judgment bears the initial burden of as-

serting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top–Flite Golf Co.,* 335 F.3d 15, 19 (1 Cir., 2003); *De La Vega v. San Juan Star, Inc.,* 377 F.3d 111, 115–16 (1 Cir., 2004). " 'Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show, through materials of evidentiary quality, that such a dispute exists.' " *Cordero–Soto v. Island Finance, Inc.,* 418 F.3d 114, 119 (1 Cir., 2005) (quoting *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 66 (1 Cir., 2004)); *see also Mulvihill,* 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000)).

When considering whether to grant summary judgment, the Court must determine whether "… the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©. The Court looks to "the record on summary judgment in the light most favorable to the nonmovant." *Hoffman v. Applicators Sales and Service, Inc.,* 439 F.3d 9, 11 (1 Cir., 2006) (citing *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 50 (1 Cir., 2000)). All reasonable inferences will be drawn in the favor of the nonmoving party. *Poulis–Minott v. Smith,* 388 F.3d 354, 361 (1 Cir., 2004); *see also Alliance of Auto. Mfrs. v. Gwadosky,* 430 F.3d 30, 34 (1 Cir., 2005), *cert. denied,* 547 U.S. 1143, 126 S.Ct. 2034, 164 L.Ed.2d 806 (2006); *Santoni v. Potter,* 369 F.3d 594, 598 (1 Cir., 2004); *Mulvihill,* 335 F.3d at 19; *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d 6, 13 (1 Cir., 2003).

Despite this "notoriously liberal" standard, *Mulvihill,* 335 F.3d at 19, summary judgment cannot be construed as "a hollow threat". *Kearney v. Town of Wareham,* 316 F.3d 18, 22 (1 Cir., 2002). A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Poulis–Minott,* 388 F.3d at 362–63 (quoting *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1 Cir., 1993), *cert. denied,* 511 U.S. 1126, 114 S.Ct. 2133, 128 L.Ed.2d 863 (1994)); *Rojas–Ithier,* 394 F.3d at 42; *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1 Cir., 2004). Mere speculations raised by the nonmoving party that are unsubstantiated will not be sufficient to defeat summary judgment. *Nieves–Luciano v. Hernandez–Torres,* 397 F.3d 1, 5 (1 Cir., 2005).

In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *De La Vega,* 377 F.3d at 115; *Rojas–Ithier,* 394 F.3d at 42.

The focus at the summary judgment phase " 'should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact.' " *Rivas Rosado v. Radio Shack, Inc.,* 312 F.3d 532, 535 (1 Cir., 2002) (quoting *Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 430–31 (1 Cir., 2000)); *see also Nieves–Luciano,* 397 F.3d at 4; *Rojas–Ithier,* 394 F.3d at 42. The party objecting to summary judgment must set forth specific facts proving a genuine issue of material fact in order to "deflect the swing

of the summary judgment scythe." *Noviello v. City of Boston,* 398 F.3d 76, 84 (1 Cir., 2005) (quoting *Mulvihill,* 335 F.3d at 19). Where "the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation,'" summary judgment will be appropriate. *Forestier Fradera v. Municipality of Mayaguez,* 440 F.3d 17, 21 (1 Cir., 2006) (quoting *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1 Cir., 2003) (further internal citations omitted)). Moreover, the party objecting to summary judgment may not rest "merely on allegations or denials in [their] own pleading." Fed.R.Civ.P. 56(e)(2); *Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 425 F.3d 67, 83 (1 Cir., 2005). Instead, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### IV. Discussion

In moving for summary judgment, Mantica claims that she was not and could not have been the person who placed Morrissey's leg into the CPM machine on September 30, 2003. Further, the defendant contends that Morrissey has failed to present any evidence to support her claim that Mantica was in fact the person who placed her leg into the CPM machine. In an affidavit filed with Morrissey's Opposition (# 46) to Mantica's Motion for Summary Judgment (# 41), the plaintiff states that

Mantica is the person who placed her leg in the CPM machine on September 30, 2003. (# 46, Exh. A at 2)

### A. Medical Malpractice Standard

■ The plaintiff in a medical malpractice suit bears the burden of proving by a preponderance of the evidence that: (1) a patient-physician [2] relationship exists between the physician and the injured party; (2) the physician breached his or her duty of care; and (3) the breach was the proximate cause of the injury. *Mitchell v. United States,* 141 F.3d 8, 13 (1 Cir.1998) (applying Massachusetts law); *Rosario v. United States of America,* 824 F.Supp. 268, 277 (D.Mass., 1993) (same).

For purposes of this summary judgment motion, Mantica assumes that (1) placing a patient in a CPM machine while still wearing a knee immobilizer is a violation of the standard of care; and (2) on September 30, 2003, someone placed Morrissey's leg in a CPM machine while she was still wearing a knee immobilizer.[3] (# 43 at 2)

Additionally, again for purposes of this motion, Mantica stipulates that a nurse-patient relationship existed between herself and Morrissey on September 30, 2003. (# 43 at 7) In light of this stipulation, there is no dispute as to the first element of the medical malpractice standard. In her motion, the defendant states that the third element is not relevant for the purpose of her motion for summary judgment; Morrissey does not dispute this assertion. (# 43 at 7; # 46 at 6) Thus, only the second element of the test, whether Mantica breached her duty of care to Morrissey, is at issue here.

---

2. The parties each cite to cases referring to a "patient-physician relationship." In doing so, they agree that Mantica, a medical professional, is held to such a standard.

3. While making this latter assumption, Mantica denies that she placed Morrissey's knee into the CPM machine, and, consequently, denies that she breached the standard of care.

## B. The Evidence

■ The defendant contends that she did not place the plaintiff's immobilized leg into the CPM machine on September 30, 2003. Absent proof that Mantica is the person who placed her leg into the CPM, Morrissey cannot establish that the defendant breached her duty of care.

In addressing this issue, Morrissey provided descriptive statements of the person who she alleges placed her leg into the CPM machine. Mantica rebuts the plaintiff's descriptions with statements of her own appearance, hours at the hospital, and care provided to Morrissey. The conflicting evidence is as follows.

### 1. Physical Description

Morrissey testified that the "young female" who allegedly placed her leg in the CPM machine was "approximately 20 years old" (# 43, Exh. B at answer 3) and "in her mid-twenties. Maybe 22, 18." (# 43, Exh. J at 235) Mantica states that she was born on January 15, 1961, making her 42 years old on September 30, 2003 (# 43, Exh. C at answer 1).

The plaintiff recalls that this person was "a little overweight" (# 43, Exh. B at answer 3) and "a little on the chunky side ... maybe my size." (# 43, Exh. I at 65) Morrissey's medical records reflect that, in September of 2003, she weighed approximately 214 pounds. (# 43, Exh. N) Mantica states that in September 2003 her weight fluctuated between 145 and 150 pounds. (# 43, Exh. D at¶ 8)

With respect to height, Morrissey stated that the nurse was "approximately 5'." (# 43, Exh. B at answer 3) Mantica states that she is five feet, four and a half inches tall (5'4½"). (# 43, Exh. D at ¶ 8)

Finally, Morrissey testified that the person in question had "brown hair" (# 43, Exh. B at answer 3) "kind of cut like maybe to the shoulder" (# 43, Exh. I at 65). To illustrate her own hair, Mantica has provided a photograph taken in the fall of 2003 (# 43, Exh. D at Exh. 1) which she contends shows that her hair was both "lighter and shorter than that described by plaintiff." (# 43 at 10)

### 2. Clothing

Morrissey testified that the person who she alleges placed her into the CPM machine on September 30, 2003 was wearing a "smock-type outfit." (# 43, Exh. J at 234) Mantica contends that as a student she was not allowed to wear a smock-type hospital uniform. (# 43, Exh. D at ¶ 3) Rather, she wore a "light to medium blue and white striped short-sleeved button down shirt, with one breast pocket" and "an emblem from Middlesex Community College on the left sleeve." (# 43, Exh. D at¶ 3)

### 3. Timing

Based upon her recollection, the plaintiff stated that her leg was placed in the CPM machine "between 9:00 and 10:00 in the morning" and was in the CPM machine "till lunchtime." (# 43, Exh. I at 68) Morrissey also testified that she was in the CPM machine for the entirety of her mother-in-law's visit, which lasted until "12:30–ish." (# 43, Exh. I at 67; Exh. K at 16) Additionally, the plaintiff stated that the person who placed her in the CPM machine also took her out of the machine. (# 43, Exh. I at 67; Exh. J at 236–238)

Mantica contends that she could not have been the person who took Morrissey out of the CPM machine because, to the best of her knowledge, she was off duty by 12:00 noon. (# 43, Exh. C at answer 9; Ex. D at¶ 2; Exh. F at 44) In her interrogatories and at her deposition, the defendant suggested that generally her shift ended at 12:00 noon, however, there is no evidence that on September 30, 2003, she left the hospital exactly at, or before, 12:00 noon.

### 4. Other Care

Morrissey testified that the person who placed her into the CPM machine on September 30, 2003 did not provide any other care to her on that day. (# 43, Exh. I at 67; Exh. J at 236–238) Although Mantica denies that she placed Morrissey's leg into the CPM machine on September 30, 2003, she admits to providing other care to the plaintiff on that day. This care included a dependent bed bath, visual assessment for skin color and turgor, auscultation of her lungs, and encouragement to turn, cough and deep breathe. (# 43, Exh. D at ¶ 5) Mantica also provided Morrissey with medication/injections in accordance with her doctor's orders. (# 43, Exh. D at ¶ 5)

### C. William Fennell

Medical records submitted by the parties indicate that a CPM was in fact utilized in the course of Morrissey's care on September 30, 2003. These records include progress notes containing the notation, "CPM applied to left knee, zero to 45 degrees." (# 43, Exh. H at 13) William Fennell ("Fennell"), an orthopedic technologist at LGH, wrote that note and signed his name next to it. (# 43, Exh. H at 13) Fennell does not have a specific recollection of Morrissey or of the care provided to her. (# 43, Exh. H at 14, 29) Additionally, Fennell testified that he does not know Mantica. (# 43, Exh. H at 27)

The parties dispute the extent of Fennell's involvement in applying the CPM machine on September 30, 2003. In her motion for summary judgment, Mantica states as an undisputed fact that Fennell "testified under oath that he is the person who placed Plaintiff Charlene Morrissey in the CPM machine on September 30, 2003." (# 43, at 3, ¶ 7) Morrissey disagrees with this characterization of Fennell's testimony. The plaintiff points instead to Fennell's testimony that he never placed a patient in a CPM machine while still wearing a knee immobilizer. (# 43, Exh. H at 19)

Fennell also testified that "you would need another person to help you" put a patient into a CPM machine. (# 43, Exh. H at 24) According to Fennell's testimony, the second person could be another orthopedic technician, an aide, or a nurse. (# 43, Exh. H at 24) Fennell explained that it is possible for one person to place a patient into a CPM machine, but it "would be difficult" and is "not worth the risk" of hurting the patient; he has never attempted to place a patient into a CPM machine without assistance. (# 43, Exh. H at 25) Fennell does not recall who assisted him in putting Morrissey into a CPM machine on September 30, 2003. (# 43, Exh. H at 29)

### D. Morrissey's Affidavit

In opposing Mantica's motion for summary judgment, Morrissey relies heavily on her April 10, 2008 affidavit, in which she states in relevant part that, "[o]n January 8, 2008 I attended the deposition of Elizabeth Jane Mantica, RN. At the deposition I recognized Elizabeth Jane Mantica, RN as the nurse who put my leg into the CPM machine while it was still in a knee immobilizer on September 30, 2003." (# 46, Exh. A at 2) This presents the first time in the record that Morrissey specifically and affirmatively identified Mantica. At all other times she referred to "the nurse" or "a nurse," and, as stated previously, the complaint named four defendants. (# 43, Exh. B at answer 2©; Exh. E at answer 17)

In her reply brief (# 47), the defendant argues that this affidavit is not supported by any facts and is "obviously contrived" because Morrissey submitted it five and a half years after the alleged incident, and because "every statement given by the plaintiff to date eliminates defendant Elizabeth Mantica" as the person who placed the plaintiff into the CPM machine on

September 30, 2003. (# 43 at 4) While the defendant is correct that five and a half years had passed between the time of the alleged incident and the identification of Mantica by the plaintiff, the affidavit was not filed as late as it may appear on its face. There is no evidence that Morrissey saw, or had any contact with Mantica from the date of the alleged incident in September 2003, until the January 8, 2008 deposition of the defendant, which Morrissey attended. Further, the plaintiff's affidavit was filed on April 10, 2008, a relatively short period of time after Morrissey saw Mantica at the deposition. The defendant also points to the inconsistencies between the statements made by Morrissey in describing the person who placed her in the CPM machine and Mantica's own characteristics, clothing, work schedule, and responsibilities on September 30, 2003, essentially to show that the affidavit is a recent fabrication.

Mantica contends that no genuine issue of material fact exists because Morrissey cannot "create a disputed issue of fact by the expedient of contradicting by affidavit statements previously made under oath during discovery." (# 47 at 6, citing *York v. Zurich Scudder Investments, Inc.*, 66 Mass.App.Ct. 610, 611, 849 N.E.2d 892, 895 (2006); *Benson v. Massachusetts General Hosp.*, 49 Mass.App.Ct. 530, 533, 731 N.E.2d 85, 88 (2000); *O'Brien v. Anolog Devices, Inc.*, 34 Mass.App.Ct. 905, 906, 606 N.E.2d 937, 939 (1993)).

The cited cases are not persuasive because plaintiff's statements during discovery and her affidavit are not directly contradictory. In fact, viewed in the light most favorable to Morrissey, her affidavit does not readily contradict the statements she made previously. The truth or accuracy of the statement made in the plaintiff's affidavit is a question for a jury.

Even if the statement set forth in Morrissey's affidavit appears to be in conflict with those made throughout discovery, it does not reach the level of contradiction seen in the cases relied upon by the defendant. For example, in *Benson,* a medical malpractice case, consent forms signed by plaintiff were produced during discovery. In his opposition to defendant's motion for summary judgment, the plaintiff stated, without support and in clear contradiction to the documents he provided, that the hospital never "told him anything, but rather precipitately put him under the knife without obtaining his informed consent." 49 Mass.App.Ct. at 531, 731 N.E.2d at 87. The Court granted summary judgment for the defendant, concluding that plaintiff's affidavit "invited a decision by the trier of fact resting on speculation, and did not represent a basis on which 'a fair minded jury could return a verdict for the plaintiff.' " *Id.* at 532–33, 731 N.E.2d at 87–88 (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

Similarly, in *O'Brien* the Court granted summary judgment for the defendant where the plaintiff testified at her deposition that she relied on an employee handbook for her assumption that she would be employed permanently, but stated in a later filed affidavit that she was "instructed several times that if she performed her duties, she would always have employment with Anolog." 34 Mass.App.Ct. at 906, 606 N.E.2d at 939. Finally, in *York,* the Court summarized the facts by relying on the plaintiff's statements in his deposition, rather than conflicting statements made in an affidavit filed two months later. 66 Mass.App.Ct. at 611, 849 N.E.2d at 895. Though the nature of the conflicting statements is not detailed, the Court granted summary judgment for the defendant, plaintiff's former employer, stating that the plaintiff could not create an issue of fact by contradicting his deposition testimony with a later filed affidavit. *Id.*

The cases relied upon by the defendant each demonstrate situations of blatant contradiction. Morrissey's situation is distinguishable in that the plaintiff made nothing more than statements based on her memory, and never affirmatively named a different care giver as the person who placed her immobilized leg into the CPM machine on September 30, 2003. *Cf. O'Brien,* 34 Mass.App.Ct. at 906, 606 N.E.2d at 939 ("It is not, after all, as if O'Brien had become possessed of newly acquired evidence when she made her affidavit."). If Morrissey named a different care giver and later made an inconsistent statement to that in her affidavit, the situation would be more analogous to the cases upon which Mantica relies.

Leaving Morrissey's April 10, 2008 affidavit aside, a question of fact remains as to who placed Morrissey's leg into the CPM machine on September 30, 2003. While it may be true that Fennell testified that he did it, it is also true that he testified that he would not have done it alone. The plaintiff's description of the nurse who placed her immobilized leg into the CPM machine does not unequivocally describe Mantica, but the defendant's description and the plaintiff's characterizations are not so different as to absolve Mantica conclusively as a matter of law. As the record stands, a genuine issue of material fact exists as to whether Mantica placed Morrissey's leg into a CPM machine while still in an immobilizer on September 30, 2003, and thus, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Poulis–Minott,* 388 F.3d at 363 (internal quotations and citations omitted); *see also* Fed.R.Civ.P. 56(c).

### E. Plaintiff's Expert Report

■ In further support of her motion, Mantica asserts that because the plaintiff's expert, David Morley, M.D., did not specifically name the defendant in his report, summary judgment must be granted. The defendant advances no argument or case law in support of this proposition.

In his report, Dr. Morley offers his opinion as to the general standard of care for a nurse in the specific circumstances alleged in this case. He states:

> The standard of care of a nurse responsible for postoperative knee replacement therapy in 2004 required when utilizing a constant passive motion device is to ensure that the patient's knee is unrestricted and moving freely. It is my opinion to a reasonable degree of medical certainty that, in 2004, the standard of care required that a patient whose post-operative knee was immobilized, should have been removed from the knee immobilizer prior to placing the knee into a constant passive motion machine. It is my opinion to a reasonable degree of medical certainty that placing a patient's knee, status post knee replacement, into the constant passive motion device while still in an immobilizer is a breach of the standard of care. It is my opinion to a reasonable degree of medical certainty that a breach of the standard of care will more likely than not cause post-operative stress, interfere with the healing process and potentially create the need for subsequent medical intervention.

# 43, Exh. L at 1–2

■ The plaintiff in a medical malpractice case "may carry his or her burden of proof on the issues of negligence and causation only with the assistance of" a medical expert. *Mitchell,* 141 F.3d at 13. Expert testimony is required to prove (1) causation; and (2) breach of duty of care. *Harlow v. Chin,* 405 Mass. 697, 702, 545 N.E.2d 602, 605 (1989) ("causal link generally must be established by expert testimony that the injury was more probably than not a result of the physician's negligence");

*Forlano v. Hughes,* 393 Mass. 502, 507, 471 N.E.2d 1315, 1319 (1984) (expert testimony generally needed to show breach of duty of care).

These cases do not suggest that the expert must specifically identify the defendant, but rather that the expert must offer an opinion as to the standard of care of a medical provider in the defendant's position under similar circumstances. *Mitchell,* 141 F.3d at 13 ("physician is held to the standard of care and skill of the average practitioner of the medical specialty in question, taking into account the advances in the profession"). Dr. Morley has stated his opinion regarding the standard of care for a nurse in the particular circumstances of this case; this is sufficient. Dr. Morley need not offer expert testimony as to the identity of the defendant.

### V. Conclusion and Order

For the foregoing reasons, it is ORDERED that defendant Elizabeth Mantica's Motion for Summary Judgment (# 41) be, and the same hereby is, DENIED.